## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### Statesville Division

| | |
|---|---|
| **ANTHONY RICHARD CROUSE** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>**EQUIFAX INFORMATION SERVICES, LLC** )<br>SERVE: Corporation Service Company, Reg. Agent )<br>2626 Glenwood Avenue, Suite 550 )<br>Raleigh, NC 27608 )<br><br>and )<br><br>**TRANS UNION, LLC,** )<br>SERVE: Corporation Service Company, Reg. Agent )<br>2626 Glenwood Avenue, Suite 550 )<br>Raleigh, NC 27608 )<br><br>**Defendants.** )<br> ) | **Civil Action No. _____** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Anthony Richard Crouse, by counsel, and for his Complaint against Defendants Equifax Information Services, LLC ("Equifax) and Trans Union, LLC ("Trans Union"), he states as follows:

### PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.     Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs," whereas Equifax and Trans Union are collectively referred to as the "CRA Defendants").

3.     The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4.     Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5.     The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

6.     The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply

parrot information they receive from entities like Verizon, particularly when a consumer makes a dispute about information reported.

7.      Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity is Verizon (the "Furnisher"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

8.      Plaintiff brings claims under Section 1681e(b) against Equifax and Trans Union because each reported inaccurate and derogatory information about Plaintiff. When Plaintiff disputed the inaccuracies, Equifax and Trans Union did not reasonably investigate, also violating Section 1681i.

9.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax and Trans Union have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax and Trans Union have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

11.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1). All Defendants are residents of this District and Division.

## PARTIES

12.      Plaintiff is a natural person residing in the State of Utah, and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.      Equifax is a foreign limited liability company authorized to do business in the State of North Carolina through its registered agent in Raleigh, NC.

14.      Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15.      Equifax disburses consumer reports to third parties under contract for monetary compensation.

16.      Trans Union is a foreign limited liability company authorized to do business in the State of North Carolina through its registered agent in Raleigh, NC.

17.      Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.      Trans Union disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

***Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers***

4

19.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

20.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

21.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in

whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….

Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….

Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

22.    Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23.    Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

24.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

25.     It has long been the law that a CRA, such as Equifax or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

26.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort

7

it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

27.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

28.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

29.     It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

### Plaintiff Receives Billing Statement from Verizon Wireless ("Verizon")
### for a Fraudulent Account

30.     In or around January 2025, Plaintiff unexpectedly received a billing statement from Verizon Wireless reflecting charges for two (2) Apple iPhone 16 Pro Max devices and corresponding wireless service lines ending in 704-466-0229 and 704-466-0793.

31.     The account was identified as Account No. 227173438-00001 ("Fraudulent Account") and indicated an online purchase made on December 19, 2024, with a *credit card ending in 8490*, information that Plaintiff did not recognize, authorize, or use.

32.     The billing statement listed Plaintiff's full name and home address at 5443 W. Highway 27, Vale, North Carolina 28168, creating the appearance that Plaintiff had personally opened and financed the Verizon account.

33.     The invoice referenced an "Online Order # E331201," an initial payment of $162.00, and two device-payment agreements totaling over $2,300.00, all supported by Verizon's internal "new-customer" activation records.

34.     Plaintiff was immediately alarmed and confused, as he had never purchased, financed, or activated any Verizon Wireless devices or services, nor had he authorized any person to do so on his behalf. The fraudulent account included premium plan features "Unlimited Ultimate, Disney Bundle, Apple Music Family, YouTube Premium, and Verizon Mobile Protect", none of which Plaintiff had ever subscribed to, used, or accessed.

35.     Believing the statement to be an error, Plaintiff promptly verified his financial

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

records and confirmed that no such transaction had been made using any of his accounts.

*Plaintiff Directly Contacted Verizon*

36.     In or around February 2024, acting promptly, diligently, and in good faith, Plaintiff immediately contacted Verizon's customer-service department to report that he had no business relationship or account with Verizon.

37.     During that call, a Verizon employee informed Plaintiff that someone had gone online and used his personal identifying information to purchase phones in his name. The employee further stated that Plaintiff was a victim of identity theft and that Verizon would correct the issue.

38.     However, in or around February 2025, Plaintiff received additional Verizon billing statements, now reflecting a growing balance and delinquency. Plaintiff again called Verizon to dispute the charges and demand that Verizon immediately close the Fraudulent Account, cease billing activity, and ensure that no derogatory information would be reported to any credit bureau.

39.     Despite receiving clear notice and repeated calls directly from Plaintiff, Verizon failed to take any reasonable or timely corrective action. Instead, Verizon allowed the Fraudulent Account to remain active, continued to issue monthly billing statements, and ultimately reported a past-due balance of $2,980.98 under Plaintiff's name.

40.     On or about April 21, 2025, Plaintiff received yet another bill from Verizon reflecting the same fraudulent balance. Plaintiff again contacted Verizon, but the employee he spoke with refused to provide any information about the account and instead instructed Plaintiff to file a police report.

41.     Following Verizon's instruction and to protect his legal and financial interests, Plaintiff filed an Incident/Investigation Report with the Lincoln County Sheriff's Office on or

about April 22, 2025.

*Plaintiff Contacts again Verizon and MRS BPO Regarding the Fraudulent Account*

42.     In or around August 2025, after months of receiving no resolution from Verizon and continuing to receive delinquency notices, Plaintiff personally initiated another call to Verizon to follow up on the unresolved Fraudulent Account and to obtain confirmation that the matter had been corrected.

43.     When Plaintiff attempted to verify the account directly through Verizon's automated system, the call was redirected to third-party debt collector MRS BPO, LLC ("MRS"), indicating that the account had been placed in collections and was no longer being serviced directly by Verizon.

44.     Upon connecting with MRS, Plaintiff verified his identity using his full name and Social Security Number ending in 3564. The representative, identifying himself as "Rizdakhan," disclosed the following information regarding the account:

   a.   Account Holder: *Anthony Richard Crouse*;

   b.   Account Number: *0227 17343 8000001* (also referenced on Verizon billing statements as *227173438-00001*);

   c.   Account Opened: *December 2024*;

   d.   Placed with MRS: *June 12, 2025*;

   e.   Outstanding Balance: *$2,980.98*;

   f.   Primary Phone Numbers on File: *(704) 466-0229* and *(704) 466-0793* — neither recognized by Plaintiff;

   g.   Plaintiff's Confirmed Current Number: *(704) 682-5558*;

   h.   Mailing Address on File: *5443 W. Highway 27, Vale, NC 28168*;

   i.   Delivery Address: *Not available* — MRS stated Verizon had not provided it, but Plaintiff had already confirmed with law enforcement that the devices were

11

delivered to an unknown address in Gastonia, North Carolina, approximately an hour from Plaintiff's residence; and

j.  Emails on File: *briannacrouse@yahoo.com* (flagged as invalid) and *acrouse8888@gmail.com* (Plaintiff's valid email).

45.     During the conversation, Plaintiff unequivocally denied opening or authorizing the account, explained that he never received any phones or devices, and informed MRS that he had been unable to access the account because it required a security PIN that he never created.

46.     MRS confirmed that the account had been flagged as fraudulent, that no payments had ever been recorded, and that its internal "backend team" was still awaiting Verizon's investigation results. The representative also confirmed that MRS possessed no documentation showing what information or identification was used to open the account and that Verizon had not provided any such application records.

47.     Plaintiff requested that MRS send written updates on the fraud investigation by mail and email, note that he did not authorize further telephone contact, and send an itemized billing statement to his verified address. MRS agreed to these requests and confirmed the account would remain in "fraud investigation" status pending Verizon's review.

48.     Following the call, Plaintiff again contacted Verizon to confirm the placement and dispute status. Verizon verified his identity and confirmed that the Fraudulent Account remained open, flagged as fraudulent, and placed with MRS for collection with a balance of $2,980.98, yet Verizon could not provide any documentation showing the underlying application, signature, or delivery address for the devices.

49.     By August 2025, Verizon and its collection agent had actual knowledge and documentary notice that the account was fraudulent, that Plaintiff never authorized or accessed it, and that it involved mismatched emails, phone numbers, and delivery locations. Despite this

knowledge, Verizon and MRS failed to close or delete the account, continued to treat it as a valid debt.

### *Plaintiff Discovers the CRA Defendants Reporting the Fraudulent Verizon Account and He Disputes Those Inaccuracies*

50. In or around August 2025, after continued billing and collection activity from Verizon and MRS BPO, Plaintiff obtained copies of his consumer reports from Defendants Equifax and Trans Union and non-party Experian to assess whether the fraudulent Verizon account was being reported in his credit history.

51. Upon review, Plaintiff discovered that a Verizon Wireless collection account had been furnished by Verizon and reported by Defendants and non-party Experian as an active debt under Plaintiff's name.

52. Each report showed that the account had been opened in December 2024, carried an outstanding balance of approximately $2,980, and was being reported as a collection account falsely indicating that Plaintiff had defaulted on a legitimate obligation.

53. Specifically, the Equifax report reflected the Verizon Wireless account as a collection item with a balance of $2,980, status "Collection Account" and last updated in August 2025.

54. The Trans Union report likewise listed the same account, opened December 19, 2024, with a balance of $2,980, status "Collection" and remarks showing the item as disputed, yet not removed.

55. The Experian report identified the same account under number 227173XXXXXXXX, reported as a collection account past due in the amount of $2,980 as of August 2025.

56. In addition to the fraudulent Verizon Wireless collection, Plaintiff's Equifax and

Trans Union reports contained multiple items of personal information that did not belong to Plaintiff, Specifically, the Equifax report contained the following inaccurate identifiers:

    a.   Incorrect name: *Anthony Crause*;

    b.   Incorrect telephone numbers: *(828) 428-9854, (704) 928-9289, and (704) 745-8084*; and

    c.   Incorrect addresses: *1250 Hill Rd, Lincolnton, NC 28092-8955* and *1822 E. Maiden Rd Apt NA, Maiden, NC 28650-8525*, neither of which has ever been associated with Plaintiff.

57.      Plaintiff's Trans Union report likewise contained extensive false identifiers, including:

    a.   Incorrect names: *Anthony Crause* and *Anthony N. Crouse*;

    b.   Incorrect telephone numbers: *(704) 928-9289; (704) 308-6604; (828) 970-7304; (828) 428-9854; (704) 682-5556; (209) 281-2485; (704) 308-6527; (828) 334-7079; and (704) 308-6605*, most of which Plaintiff has never used or recognized; and

    c.   Incorrect addresses: *1250 Hill Rd, Lincolnton, NC 28092-8955* and *1822 E. Maiden Rd Apt NA, Maiden, NC 28650-8525.*

58.      By reporting the aforementioned fraudulent account and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendants failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

59.      Further, Defendant Trans Union was also reporting the following account inquiries, with whom Plaintiff did not have an account relationship:

    a.   Synchrony Bank Mastercard (July 11, 2025); and

    b.   PayPal via Synchrony Bank (March 30, 2025)

60.      Plaintiff did not apply for credit with any of the aforementioned entities and did not

have a relationship with any of the aforementioned entities. Defendant did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

61.     As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Defendant Trans Union on the above-referenced dates in 2025, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's credit report from Defendant Trans Union, Defendant Trans Union disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

62.     Realizing the gravity of the situation, and to protect himself from further harm, Plaintiff filed a formal Identity Theft Report with the Federal Trade Commission ("FTC Report") on September 2, 2025.

63.     In the report, Plaintiff identified the Verizon Wireless account as fraudulent and listed the total amount of $2,981 falsely attributed to him. Plaintiff also identified his former spouse, "Brianna Crouse", as a potential suspect after discovering that her email address, briannacrouse@yahoo.com, and other identifiers appeared on records connected to the account.

64.     A few days later, on September 8, 2025, Plaintiff filed an updated Incident/Investigation Report with the Lincoln County Sheriff's Office ("Police Report") identifying "Brianna Nicole Crouse", his former spouse, as the suspected individual who used his personal information to open the Verizon account. The report notes that Brianna resided at 2847 Forbes Road, Gastonia, North Carolina 28056, and that devices linked to the Verizon account were delivered to an address in Gastonia, approximately one hour from Plaintiff's residence in Vale, North Carolina.

*Plaintiff's Dispute to Defendants and Non-party Experian*

65.     Concerned that Verizon Wireless would continue to furnish false information to one or more consumer reporting agencies indicating that Plaintiff was responsible for the $2,980.00 Verizon collection account, Plaintiff determined that he needed to escalate the issue to prevent further damage to his credit files and reports.

66.     On or about September 15, 2025, Plaintiff submitted written disputes to non-party Experian, and Defendants Equifax and Trans Union.

67.     In his written disputes, Plaintiff clearly stated that the Verizon Wireless account was fraudulent and the product of identity theft, and that he had never opened, authorized, or received any services connected with such an account. Plaintiff explained that the continued reporting of this false collection account was causing serious and ongoing injury to his creditworthiness and financial standing.

68.     Plaintiff provided sufficient information to identify his credit file and sufficient information to support his dispute.

69.     Specifically, Plaintiff identified the Verizon Wireless account number and reported balance associated therewith. Plaintiff explained that he suspects his ex-wife may have used his personal identifiers to open the fraudulent account identified.

70.     In support of Plaintiff's disputes to the Defendants, Plaintiff enclosed an FTC Identity Theft Affidavit delineating the fraud that Plaintiff had fallen victim to.

71.     Plaintiff requested that the identity theft information be blocked from his credit file.

72.     Following receipt of Plaintiff's disputes, Experian conducted a reinvestigation and subsequently complied with Plaintiff's request by deleting the disputed Verizon Wireless account from his consumer file on or about October 23, 2025, and notifying the furnisher, Verizon

Wireless, of the deletion.

73.     In contrast, Defendants Equifax and Trans Union failed to delete the Fraudulent Account from Plaintiff's credit.

74.     Upon information and belief, Defendants are still reporting inaccurate and derogatory information in Plaintiff's credit files.

75.     By submitting a written dispute identifying the Verizon Wireless account as the product of identity theft, enclosing an FTC Identity Theft Affidavit, and expressly requesting that the fraudulent information be blocked from his consumer file, Plaintiff satisfied the requirements of 15 U.S.C. § 1681c-2(a).

76.     Despite receiving this statutorily sufficient identity-theft documentation, and despite having no reasonable basis to conclude within the requisite time period that the disputed information was accurate or that Plaintiff participated in the underlying transaction, Defendants Equifax and Trans Union failed to block the fraudulent Verizon Wireless account from Plaintiff's credit files within the time required by law, and instead continued to report and disseminate the identity-theft-related information. Defendants' failure to block the disputed information constitutes a violation of 15 U.S.C. § 1681c-2, and caused Plaintiff continued and avoidable harm to his credit reputation, privacy, and financial standing.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

77.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax and Trans Union to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Equifax and Trans Union use a vendor which was previously known as Intelenet Global Services and is now known as Teleperformance.

78.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

79.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

80.     Teleperformance uses low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

81.     Teleperformance agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

82.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

83.     In fact, the CRAs strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax or Trans Union. The dispute is sent to the Defendant CRAs' creditor customers (such as Verizon) for their sole review and consideration.

84.     Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

85.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc*., No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

86.     Regardless of whether these statements by the CRAs are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

87.     Equifax and Trans Union themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered Actual Harm*

88.     Defendants continued to report the fraudulent Verizon account on Plaintiff's credit reports, even after being notified that this information is false. Upon information and belief, Defendants are *still* reporting inaccurate and derogatory information on Plaintiff's credit.

89.     Plaintiff attempted to resolve these matters with Defendants, and his credit was significantly destroyed by Defendants' failures to correct the inaccurate reporting.

90.     As a result of the inaccurate credit reporting and failure to correct Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

      a.     Harm to Plaintiff's credit opportunities;

      b.     Fear of being denied credit and apprehension in applying for new credit;

      c.     Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

      d.     Loss of time attempting to correct the inaccuracies;

      e.     Stress associated with attempting to resolve this matter.

      f.     Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: sleepless nights, frustration, worry, hopelessness, harm to reputation, and loss of privacy.

91.     Plaintiff did exactly what he should have done upon realizing he was the victim of identity theft.

92.     Plaintiff communicated directly with Verizon on multiple occasions and explained that the Verizon Wireless Account was fraudulently opened and that he was the victim of identity theft.

93.     Plaintiff filed a police report.

94.     Plaintiff filed an FTC ID Theft Report.

95.     Plaintiff filed an FTC Identity Theft Affidavit.

96.     Plaintiff disputed with the Credit Bureau Defendants in September 2025.

97.     Plaintiff immediately identified himself as an identity theft victim and requested

from that the Credit Bureau Defendants block the account information that was the product of identity theft.

98.　　Despite Plaintiff's disputes to the Credit Bureau Defendants that the Verizon Wireless Account was the product of fraud and he was a victim of identity theft, Defendants Equifax and Trans Union hardly wavered in their refusals to remove the same.

99.　　As a direct result of Defendant Equifax's ardent refusal to remove the Verizon Wireless account which was a product of identity theft, Defendant Equifax has continued to saddle Plaintiff with a false and derogatory collection tradeline inaccurately reporting a $2,980 balance for a Verizon Wireless account that Plaintiff never opened, authorized, or used.

100.　　As a direct result of Defendant Trans Union's ardent refusal to remove the Oriental Bank account, which was a product of identity theft, Defendant Trans Union has continued to saddle Plaintiff with a false and derogatory collection tradeline inaccurately reporting a $2,980 balance for a Verizon Wireless account that Plaintiff never opened, authorized, or used.

101.　　Further, and due to Defendants' inexplicable refusal to remove fraudulent Verizon Wireless account from an identity theft victim's consumer file, Plaintiff expended countless hours disputing the same with Defendants Equifax and Trans Union, to no avail.

102.　　Defendants' conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that Defendants would ever properly reinvestigate his disputes.  Further, Plaintiff reasonably believes that the fraudulent Verizon Wireless account negatively impacted and depressed his credit score and debt to income ratio.

### *Defendants' Conduct was Willful*

103.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

104.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

105.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

106.     The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

107.     Just in federal court alone, during the past decade, the creditor-furnisher disputed by Plaintiff has had to defend almost 600 consumer credit lawsuits.

108.     In many of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

109.     The CRA Defendants knew or should have known of this litigation history.

110.     The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

111.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives

a small percentage of the total consumer credit reporting complaints made nationwide, as many

multiples more are made directly to the Defendants, and/or to other government agencies,

attorneys, or non-profit organizations.

112.     Each Defendant regularly receives unredacted consumer dispute details from this

database.

113.     Since the database began accepting complaints, the CFPB has sent hundreds of

thousands of consumer credit reporting complaints to Equifax.

114.     Since the database began accepting complaints, the CFPB has sent hundreds of

thousands of consumer credit reporting complaints to Trans Union.

115.     Further, over 280,000 of the CFPB complaints against Equifax and almost 270,000

complaints as to Trans Union were based largely on their failure to reasonably investigate

consumer disputes.

116.     Just in the last 12 months alone, Equifax, Trans Union and Experian have each been

sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged

that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the

consumer's accuracy dispute. This complaint history has been true for nearly every year over the

last decade.

117.     While the thousands of consumer complaints and hundreds of thousands of

consumer disputes alone would have put Defendants on notice of the failures of their dispute

investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have

placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-

customer tells them if the consumer had provided a substantive and detailed dispute.

118.    The CRAs have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols*. *LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

119.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit*

*Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

120.     Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

121.     Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

122.     In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[2]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

123.     The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to

---

[2]     *Available      at*      https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

124.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[3]

125.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

126.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

---

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

127.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

128.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
### *against Equifax and Trans Union*

129.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

130.    Equifax and Trans Union each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Verizon.

131. As a result of Equifax's and Trans Union's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, sleepless nights, frustration, worry, hopelessness, harm to reputation, and loss of privacy.

132. Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customer, Equifax and Trans Union each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

133. Equifax and Trans Union each furnished multiple consumer reports to third parties containing the inaccurate information and they did so after receiving notice of these inaccuracies.

134. The violations by Equifax and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

135. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax and Trans Union in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
***against Equifax and Trans Union***

136. Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

137.    Equifax and Trans Union each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the items from each of Plaintiff's credit files.

138.    Equifax and Trans Union each violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to the Furnisher all relevant information that they received with Plaintiff's disputes.

139.    Equifax and Trans Union each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Furnisher account.

140.    Equifax and Trans Union each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

141.    As a result of Equifax's and Trans Union's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, sleepless nights, frustration, worry, hopelessness, harm to reputation, and loss of privacy.

142.    The violations by Equifax and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

143.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax and Trans Union in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT III:
## VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681c-2
### *against Equifax and Trans Union*

144.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

145.    Equifax and Trans Union each violated 15 U.S.C. § 1681c-2(a) by failing to block from Plaintiff's credit files information that Plaintiff identified as the product of identity theft, after Plaintiff submitted a statutorily sufficient identity theft report and expressly requested that such information be blocked.

146.    Plaintiff provided Defendants with an Identity Theft Report within the meaning of 15 U.S.C. § 1681c-2(c), including an FTC Identity Theft Affidavit, clearly identifying the Verizon Wireless account as fraudulent, identifying the specific account at issue, and affirmatively requesting that the identity-theft-related information be blocked from his consumer files.

147.    Despite receiving Plaintiff's Identity Theft Report and block request, and despite lacking any reasonable basis to determine that the disputed information was accurate or that Plaintiff participated in the underlying transaction, Equifax and Trans Union failed to block the fraudulent Verizon Wireless account from Plaintiff's credit files within the time required by law, and instead continued to maintain, report, and disseminate the identity-theft-related information.

148.    As a direct and proximate result of Equifax's and Trans Union's violations of 15 U.S.C. § 1681c-2, Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, fear and apprehension in applying for credit, loss of time attempting to correct the inaccuracies, sleepless nights, frustration, worry, hopelessness, harm to reputation, and loss of privacy.

149.    The violations by Equifax and Trans Union were willful, rendering each of the CRA Defendants individually liable for statutory and punitive damages in an amount to be determined

by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

150.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Equifax and Trans Union in amounts to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax and Trans Union;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

ANTHONY RICHARD CROUSE

BY: /s/ *Leonard A. Bennett*
Leonard A. Bennett, NCSB #21576
Mark C. Leffler*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

31

*Counsel for Plaintiff*
*\*Pro hac vice forthcoming*